FILED
2013 Sep-30  PM 12:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| ERNST L. BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 5:11-CV-3131-KOB |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

The plaintiff, Ernst L. Brown, brings this action pursuant to the provisions of section 205(g) of the Social Security Act 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration denying his application for Social Security Benefits.  Claimant timely pursued and exhausted his administrative remedies available before the Commissioner.  Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act, 42 U.S.C. § 405(g). For the reasons stated below, the Commissioner's decision is due to be affirmed.

## STANDARD OF REVIEW

The sole function of this court is to determine whether substantial evidence supports the decision of the Commissioner and whether she applied proper legal standards.  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  To

that end, this court "must scrutinize the record as a whole to determine if the decision

reached is reasonable and supported by substantial evidence."  <u>Bloodsworth</u>, 730 F.2d at

1239 (citations omitted).  Substantial evidence is "such relevant evidence as a

reasonable person would accept as adequate to support a conclusion."  <u>Bloodsworth</u>,

730 F.2d at 1239.

## STATUTORY AND REGULATORY FRAMEWORK

To qualify for disability benefits and to establish his entitlement for a

period of disability, a claimant must be disabled.  The Act defines disabled as the

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than

twelve months . . . ."  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i).  For the purposes of

establishing entitlement to disability benefits, "physical or mental impairment" is

defined as "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory

diagnostic techniques."  42 U.S.C. § 423(d)(3).

To make this determination, the Commissioner employs a five-step,

sequential evaluation process:

> (1) Is the person presently employed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific
> impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. I?

2

(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

In the instant case, the ALJ determined the claimant met the first two tests, but concluded he did not suffer from a listed impairment.  The ALJ found the claimant unable to perform his past relevant work.  Once the ALJ determines that the claimant cannot return to his prior work, "the burden shifts to the [Commissioner] to show other work the claimant can do."  Foote, 67 F.3d 1553, 1559 (11th Cir. 1995). When a claimant is not able to perform the full range of work at a particular exertional level, the Commissioner may not exclusively rely on the Medical-Vocational Guidelines (the "grids").  Id., 1558-59.  The presence of a non-exertional impairment, such as pain, fatigue or mental illness, also prevents exclusive reliance on the grids.  Id., 1559.  In such cases "the [Commissioner] must seek expert vocational testimony.  Id., at 1559.

The ALJ found the claimant had the residual functional capacity (RFC)  to perform a reduced range of light work.  R. 19.  A vocational expert testified at the claimant's ALJ hearing that with that RFC the claimant would be able to perform

3

representative occupations, such as an assembler, a laundry sorter, and a packager.  R. 70. Based upon that testimony, the ALJ found the claimant was not disabled at step five.

## DISCUSSION

This appeal involves a claimant who alleges disability caused by back pain beginning on January 6, 2009. R. 16.  Few recent diagnostic imaging studies are in the medical record.  An MRI scan in 2001 showed mild degenerative disc disease at L4-5 with a broad based posterior disc protrusion, which minimally indented the ventral thecal sac.  The protrusion did not cause significant canal stenosis.  R. 275.  No other MRI scans are in the record.  An x-ray dated April 1, 2006, shows no significant abnormality.  R. 177.  The report states that "[v]ertebral heights and disc spaces are preserved."  The final diagnostic imaging in the record are x-rays done at the time of the consultative physical examination by Dr. Reddy on April 9, 2009.  These x-rays show only moderate degenerative disc disease and early osteoarthritis at L5-S1.  R. 200.

In spite of the lack of diagnostic confirmation of significant spinal cord involvement, the claimant was prescribed narcotic pain medication over a long period of time.  The claimant was treated by Dr. Barnett prior to his alleged onset date of disability.  The office records of Dr. Barnett show he treated the claimant from May 2, 2006, through September 20, 2008, for low back pain. R. 184-191.   Dr. Barnett's records indicate the claimant was seen every two-to-three months during that time.  He was also prescribed Lortab, Xanax, and Soma for low back pain.  When he was seen on

4

November 13, 2007, the record notes that claimant reported feeling good.  R. 186.  On

February 20, 2008, Dr. Barnett noted the claimant reported that his back was "doing

well with exercises and medications."  R. 185.  In September 2008, Dr. Barnett's

records indicate a urine drug screen was positive only for benzodiazepines (Xanax),

indicating the claimant was not taking his Lortab as prescribed.  Dr. Barnett dismissed

the claimant from treatment.  R. 184.

   The claimant was also seen for pain management by Dr. Pouparinas.

Although Dr. Pouparinas saw the claimant as early as 1997, large gaps exist in

treatment.  After August 9, 2002, the claimant was not seen again by Dr. Pouparinas

until February 2008.  Dr. Pouparinas's records show that after February 2008 the

claimant was prescribed Lortab, Xanax, and Mobic for low back pain.  These

prescriptions were refilled monthly.  However, Dr. Pouparinas dismissed the claimant

from treatment on September 19, 2008, after drug screen testing indicated the claimant

was not taking his medications as prescribed.  R. 262.  An August 21, 2008, drug screen

was negative for both Xanax and Lortab.  It was also positive for oxycodone, which had

not been prescribed by Dr. Pouparinas.  R. 264.

   The claimant was not treated again by Dr. Pouparinas until January 28,

2009.  At that time Dr. Pouparinas again prescribed Lortab, Xanax, and Mobic.  R. 261.

The claimant was seen by Dr. Pouparinas on February 24, 2009, and his medications

were refilled.  R. 258.  A urine drug screen taken that date showed the claimant was in

the appropriate range for opiates.  However, his drug screen was negative for Xanax.  R.

259.  On March 25, 2009, Dr. Pouparinas refilled the claimant's medications.  R. 257.

A consultative physical examination was conducted at the request of the

Social Security Administration by Dr. Reddy on April 9, 2009.  At that time the

claimant reported his medications included Lortab 10 mg, three times a day, Soma 350

mg, two times a day, and Xanax 2 mg, two times a day.  R. 196.  Dr. Reddy noted

straight leg raising test was positive bilaterally.[1]  R. 197.  The claimant presented for the

exam using a cane, which he indicated he had gotten on his own.  R. 196.  However,

during the examination Dr. Reddy noted the claimant's gait without a cane was without

a limp.  The claimant stated that he was unable to walk on his toes and heels because it

put too much pressure on his back.  He stated that he was unable to squat for similar

reasons.  Dr. Reddy was unable to do range of motion testing of the hips or knees

because the claimant was unable to lie down on the examining table.  R. 197.  Dr.

Reddy found no localized muscle atrophy or deformities of the joints.  The claimant's

range of motion in the cervical spine was normal.  R. 198.  In the dorsolumbar spine,

range of motion was reduced.  R. 198.  X-rays of the lumbar spine were interpreted to

show moderate degenerative disc disease and early osteoarthritis at L5-S1.  R. 200.

---

[1] The straight leg raise test is also known as Lasègue's sign: "In sciatica, flexion of the hip is painful when the knee is extended, but painless when the knee is flexed. This distinguishes the disorder from disease of the hip joint." Dorland's Illustrated Medical Dictionary 1525 (28th Edition).

The record contains a physical capacity evaluation and clinical assessment completed by Dr. Pouparinas dated April 17, 2009.  R. 251-255.  On that form Dr. Pouparinas limited the claimant to a total of two hours sitting and one hour standing/walking in an eight-hour workday.  He was limited to lifting 10 pounds occasionally.  R. 251.  On the clinical assessment of pain form, Dr. Pouparinas indicated the claimant had pain to such an extent as to be distracting to adequate performance of daily activities.  R. 252.  He also indicated that medication side effects would be expected to be severe and to limit the claimant's effectiveness due to distraction, inattention and drowsiness.  R. 253.

On April 23, 2009,  the claimant saw Dr. Pouparinas.  The treatment note states the claimant had a history of narcotic contract violations and mentioned his failed August 2008 drug screen.  R. 256.  The treatment note contains the following: "Circumstances discussed fully with patient.  Understands that I enforce terms of the drug contract without compromise."  R. 256.  The claimant's prescriptions were refilled and he was given a urine drug screen test.  The test showed the claimant's levels of opiates was less than the expected value and was negative for Xanax. R. 246.

On May 22, 2009, the claimant saw Dr. Pouparinas and his medications were refilled.  He was also given a drug screen test, which was negative for both Lortab and Xanax.  R. 244.  On June 17, 2009, Dr. Pouparinas saw the claimant and discussed the repeated irregularities in his drug screens.  The note states the discussion "[t]ouched

on drug diversion– warning issued." R. 236. On July 15, 2009, Dr. Pouparinas noted

that the claimant was "doing fine" and that his "pain is pretty well-managed on this

current regimen." R. 235. The claimant's prescriptions were refilled. A drug screen

was taken, which was negative for both Lortab and Xanax. R. 242.

The claimant saw Dr. Pouparinas on August 12, 2009. He noted the

claimant "professes and appears to be compliant" with medications. R. 235. However,

the note states the claimant's multiple failed drug tests were discussed. It also reflects

the claimant reported his medications enabled "him to do more with a minimum of pain

and suffering." Dr. Pouparinas stated the claimant "[r]emains able to enjoy daily

activities and chores alike." R. 235. Although the August 12 treatment note indicates

the claimant's medications were refilled, it also contains the following notation:

"Dismiss from opioid [treatment]." R. 235. This treatment note is the final one from

Dr. Pouparinas in the record.

The record contains no treatment notes from August 12, 2009, until March

12, 2010, when the claimant saw Dr. Harris, a neurologist. The treatment note states

that the claimant reported he had experienced "burning pain" and "pins and needles like

sensation in his lower back radiating into his right leg" since he injured his back in the

mid 1990's. R. 249. The note states the claimant's medication regimen included

8

Lortab, Xanax, and Soma[2]. On physical examination Dr. Harris found the claimant's coordination and gait exams were within normal limits. However Dr. Harris noted "the patient does have a positive straight leg raise bilaterally." R. 249. Dr. Harris's diagnostic impression was that the "patient appears to have a lumbar radiculopathy by exam." R. 250. Dr. Harris agreed to prescribe Lortab and Soma and had the claimant complete a narcotic contract. Dr. Harris added Lyrica for prophylactic control of the claimant's pain.

The final treatment note in the record from Dr. Harris is from an April 23, 2010, visit. That note states the claimant reported no change in his pain levels. R. 248. It also indicates the claimant requested a prescription for Xanax for anxiety. R. 248. Instead, Dr. Harris added Cymbalta "to treat the anxiety and back pain." R. 248. This note is the final treatment note in the record.

Dr. Harris also completed a physical capacity evaluation on June 20, 2010. Dr. Harris indicated the claimant would be able to lift 20 pounds occasionally. As Dr. Pouparinas had done, Dr. Harris indicated the claimant did not need a cane for ambulation. He indicated the claimant would be able to sit four hours in an eight-hour day and could walk/stand for a total of one hour. R. 276. Dr. Harris indicated that the claimant's pain would be virtually incapacitating and side effects to medications would be expected to be severe. R. 277-76.

---

[2] No treatment notes show a current prescription for the medications.

9

On appeal, the claimant argues the ALJ improperly refused to credit the physical capacity evaluations and clinical assessment of pain forms submitted by Dr. Pouparinas and Dr. Harris.   "The testimony of a treating physician must ordinarily be given substantial or considerable weight unless good cause is shown to the contrary." McGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); accord Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991).  The ALJ "must specify what weight is given to a treating physician's opinion and any reason for giving it no weight . . . ."  McGregor, 786 F.2d at 1053.  Good cause exists to reject a treating physician's opinion if it is not bolstered by the evidence or is inconsistent with the doctor's own treatment records.  Lewis v. Callahan,125 F.3d 1436, 1440 (11th Cir. 1997).

The ALJ discussed the opinions of Dr. Pouparinas and Dr. Harris extensively in his decision and articulated a number of reason why he found them not credible.  The ALJ found the doctors' own treatment records did not support the forms they submitted, and discussed several areas in which the treatment notes conflicted with the forms.  For example, the ALJ observed that Dr. Pouparinas's treatment notes showed the claimant reported his pain was well managed and that he had no side effects from his medications:

> As noted above, on April 23, 2009, the claimant denied having any side
> effects from his medications, and he also stated that he was not having
> any dizziness, grogginess, or unsteadiness.  It was noted by Dr.
> Pouparinas on June 17, 2009 that the claimant was "doing fine"; that "his

pain was pretty well managed on this current regimen"; and that he was not having any adverse drug side effects.  On August 12, 2009, he reported that his medications enabled him to do more with a minimum of pain, and he remained able to enjoy his daily living activities and chores. He again denied having any side effects from medication.

R. 22.

The ALJ also noted inconsistencies between Dr. Harris's treatment records, and the restrictions placed on the claimant by the forms submitted:

Dr. Harris noted that the claimant walked with a normal gait when he saw him in March 2010, and no mention of a cane was made.  Dr. Harris also noted that strength was 5/5 in both legs; sensation was normal; and reflexes were 2+ and equal.  These findings are inconsistent with the disabling pain and limitations opined by Drs. Harris and Pouparinas, as are the notations that pain is well managed.

R. 23.

The ALJ considered other evidence that failed to bolster the doctors' opinions, such as the diagnostic imaging, conservative treatment, and lack of referral to an orthopedic specialist:

Objective and clinical findings are also inconsistent with the assessments completed by Dr. Pouparinas and Dr. Harris.  The MRI, in 2002, was noted to show only mild disc protrusion.  Lumbar spine x-rays, taken by Dr. Reddy, were interpreted as showing only moderate degenerative disc disease and early osteoarthritis at L5-S1.  The record does not indicate that surgery has ever been recommended.  The evidence contained in the record, which dates back to 1997, does not show that the claimant has ever been referred to an orthopedic surgeon or neurosurgeon, despite his long-standing allegations of chronic back pain.

R. 22-23.

The ALJ noted in his opinion that during 2008 both Dr. Barnett and Dr. Pouparinas saw the claimant.  Both prescribed narcotic pain medications, and both doctors dismissed the claimant as a patient in September 2008 because of drug screens inconsistent with proper compliance with prescribed medication therapy.  R. 21.  The ALJ found this behavior called into question the claimant's trustworthiness about the symptoms he reported to his treating physicians:

> Dr. Pouparinas' records also reflect that the claimant failed multiple drug screen tests and that he was dismissed from treatment for a period of time, indicative that the claimant has been less than fully forthcoming with Dr. Pouparinas regarding his symptoms and compliance with treatment.  It is also noted that Dr. Pouparinas' records do not indicate that the claimant had run out of his medications prior to drug screen testing, which is inconsistent with [claimant's] testimony in that regard.  Dr. Barnett's records also indicate that the claimant was dismissed from treatment.

R. 23.  Doctors rely upon the honesty of their patients regarding their symptoms. Therefore, the claimant's lack of honesty with his doctors is additional evidence supporting  the ALJ's refusal to credit the physical capacity evaluations and clinical assessment of pain forms completed by his doctors.

The reasons articulated by the ALJ constitute good cause for his refusal to credit the physical capacity evaluations and clinical assessment of pain forms submitted by Dr. Pouparinas and Dr. Harris.  The forms were not bolstered by the evidence and were inconsistent with the physicians' own treatment notes.  Therefore, the ALJ applied the proper legal standards in considering the opinions of the claimant's treating

physicians.  His refusal to credit those opinions was reasonable and supported by substantial evidence.

### CONCLUSION

Having carefully reviewed the entire record in this case, the court concludes that substantial evidence supports the Commissioner's decision and that the ALJ applied the proper legal standards in reaching that decision.  Accordingly, the court must affirm the decision of the Commissioner.

The court will enter an appropriate order contemporaneously with this opinion.

DONE and ORDERED this 30th day of September, 2013.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

13